UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TAMAR D. HARVEY,
*Plaintiff*,

v.                                             1:20-cv-605-MSN-WEF

SERGEANT HOBBS, ET AL.,
*Defendants*.

MEMORANDUM OPINION

Tamar D. Harvey ("Plaintiff" or "Harvey"), a Virginia prisoner proceeding *pro se*, filed a

civil rights action under 42 U.S.C. § 1983 alleging twenty-five claims against thirty-one

defendants. [Dkt. No. 1]. After the complaint was screened and deficiencies were noted, Plaintiff

was given leave to amend, and he filed an amended complaint on August 18, 2020. The amended

complaint alleged seventeen claims against nineteen defendants. [Dkt. No. 10]. All but two claims

(Claims 2 and 8) have previously been resolved in Memorandum Opinions. [Dkt. Nos. 73, 88, 93].

The two remaining claims are the following:

> *Claim 2*: Defendants Coleman, Bailey, and Holloway violated Harvey's Eighth
> Amendment rights because they were deliberately indifferent to his serious medical
> needs and the conditions of his confinement from April 3, 2018 through July 6,
> 2018, depriving him of adequate indoor and outdoor recreation time, which caused
> him hemorrhoids, anal dryness, and other health issues. [Dkt. No. 10 at 13].
>
> *Claim 8*: Defendants Coleman and Green violated Harvey's First Amendment
> rights by retaliating against him by moving him to "Section 3"on May 17, 2019,
> where "[his] risk of physical/sexual attack was very pervasive," because he had
> filed grievances and a lawsuit against both related to Harvey's TV. [*Id.* at 18].

On September 28, 2022, Plaintiff filed a motion for summary judgment, along with a brief and a

declaration. [Dkt Nos. 104–06]. Defendants (M.A. Bailey, Ralph R. Coleman, Timothy W. Green,

Gregory L. Holloway) filed a cross motion for summary judgment on Claims 2 and 8 and a reply

to Plaintiff's motion for summary judgment. [Dkt. Nos. 111–12, 114]. Plaintiff was advised of his right to respond in accordance with Local Civil Rule 7(K) and *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and he filed a response in opposition. [Dkt. No. 137, 141]. Accordingly, this matter is now ripe for disposition. For the reasons that follow, Plaintiff's motion for summary judgment must be denied and Defendants' motion for summary judgment must be granted.

## I.    Undisputed Statement of Facts[1]

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P.; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. "[A] party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact."

---

[1] The record of admissible evidence includes Defendants' affidavits and exhibits [Dkt. Nos. 112-1 through 112-4]. The Court has also reviewed Plaintiff's sworn pleadings, including his attachments that relate to Claims 2 and 8 [Dkt. Nos. 1, 1-1 through 1-7; 10, 10-1; 11; 50, 50-1 through 50-3; 55, 55-1; 66; 105–06; 137, 137-1; 141], in determining the relevant material undisputed facts. Plaintiff's pleadings lack clarity and organization, and include over 900 pages of often repetitive exhibits. Plaintiff has previously been made aware that while "the Court 'is mindful of its duty to construe a *pro se* litigant's pleadings liberally, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), a district court is neither required to act as an advocate for a *pro se* litigant, *id.*, nor to 'sift through' pleadings in an attempt to construct legal arguments or theories for him. *See Fields v. Romer*, 2000 U.S. App. LEXIS 27291, at *10 (10th Cir. Oct. 30, 2000) (citation omitted)." [Dkt. No. 88 at n.8] (citing *United States v. Tooley*, 521 F. App'x 644, 646 (10th Cir. 2013) (a "court cannot take on the responsibility of serving as the [*pro se*] litigant's attorney in constructing arguments and searching the record") (quoting *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005)).

*Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)). Parties asserting that a fact cannot be or is genuinely disputed must comply with the requirements of Fed. R. Civ. P. 56(c) and Local Civ. R. 56(B).

Plaintiff's motion for summary judgment does not comply with either Federal Rule 56 or Local Rule 56. While Plaintiff's motion does contain a list of alleged undisputed facts, his list mostly includes either irrelevant matters, unsupported conclusory statements, or argument instead of facts. Further, Plaintiff does not point to the portions of the record that would support his alleged assertions of fact. *See* Local Rule 56(b) (requiring motion to "cit[e] the parts of the record relied on to support the listed facts as alleged to be undisputed"). Even when Plaintiff does refer to other matters in the record, it is not clear why or what in the reference allegedly supports the point he is asserting. Plaintiff's failure to comply with Federal Rule 56 and Local Rule 56 leave Defendants unable to respond to Plaintiff's assertions of fact because he has not cited to a relevant portion of the record. [Dkt. No. 114 at 3-6].

Defendants, in compliance with Federal Rule 56 and Local Rule 56, set forth a statement of material facts that they contend are undisputed. Plaintiff's response to Defendants' motion is more aptly described as a brief in support of his motion for summary judgment. The response is poorly organized, disjointed, and has over 170 pages of attachments, which are intended to support Plaintiff's motion for summary judgment but do not clearly correspond to or dispute an assertion of undisputed fact by Defendants. [Dkt. Nos. 137, 137-1]; *see* Local Rule 56(b) (requiring response brief to "cit[e] to the parts of the record relied on to support the facts alleged to be in dispute").[2]

---

[2] Plaintiff's *pro se* status does not require the Court to "sift through [his] brief in an attempt to construct legal arguments or theories for him." *Fields v. Romer*, No. 99-1331, 2000 U.S. App. LEXIS 27291, at *9 n.2 (10th Cir. Oct. 30, 2000); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . [but] allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact.").

Plaintiff's "failure to cite to record evidence means that no dispute has been raised." *Hadeed v. Abraham*, 265 F. Supp.2d 614, 620 n.19 (E.D. Va. 2003); *Taylor v. CNA Corp.*, 782 F.Supp.2d 182, 186 n.1 (E.D. Va. 2010) (where a defendant identifies facts in the record to support his motion for summary judgment, and the nonmovant fails "to cite evidence in the record to dispute those facts, the facts . . . identified are taken as true"); *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (the party opposing summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). Moreover, a party cannot create a disputed issue of material fact simply by contradicting his own testimony or admission. *See Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 367 (4th Cir. 2022) ("for the purpose of summary judgment, '[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct'") (quoting *Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 198 (4th Cir. 1997)). Accordingly, the following statement of uncontested facts is derived from a review of Defendants' statement of undisputed facts, Plaintiff's responses, and the record.

1.      Plaintiff Harvey is a Virginia Department of Corrections ("VDOC") inmate who was transferred from the Augusta Correctional Center to the Greensville Correctional Center ("GCC") on February 21, 2018, and was at GCC during the times relevant to his claims. [Dkt. No. 55-1 at 29].

2.      Defendant Holloway is currently the Regional Operations Chief for the Western Region, VDOC, but he was the Eastern Regional Operations Chief from 2018 to 2020. [Dkt. No. 112-4 at ¶ 1]. In 2018, Holloway was not involved in the day-to-day operations at GCC and was not involved in scheduling recreation for inmates at GCC, including inmate Harvey. [*Id.* at ¶ 4].

3.      Defendant Bailey has served as the Warden at Lunenburg Correctional Center since August 2020. He was previously assigned to GCC on April 10, 2018, as Acting Senior Warden. In March 2019, Bailey was promoted to Warden Senior at GCC. [Dkt. 112-3 at ¶ 1].

4.      Defendant Coleman was a Lieutenant formerly employed at GCC, a VDOC facility, during the relevant time. [Dkt. No. 127-1 at ¶ 1].

5.      Defendant Green is an Assistant Warden at Sussex I State Prison but was formerly a Unit Manager at GCC. [Dkt. No. 112-1 at ¶ 1]. In May 2019, Green was the Unit Manager of Housing Unit 6 ("HU6") at GCC and responsible for the overall operation of HU6. [*Id.* at ¶ 4].

### A. Claim 2, Deprivation of Recreation
### (Defendants Coleman, Bailey, and Holloway)

6.      Harvey alleges that he did not receive adequate recreation at GCC during the months of April through July 2018, and that Holloway, Coleman, and Bailey were indifferent to his recreation needs. Harvey further alleges that due to the lack of adequate recreation, he suffered from hemorrhoids, anal dryness, and perhaps other digestive issues. [Dkt. No. 112-4 at ¶ 3].

7.      Harvey was assigned to Housing Unit 6, Pod 3 ("HU6-3") from April 11, 2018, to July 6, 2018. [Dkt. No. 112-3 at ¶ 4]. Harvey had recreation and/or exercise opportunities at GCC during the April to July 2018 time. [*Id.* at ¶ 8].

8.      While housed in HU6-3 during the aforementioned months, Harvey had opportunities for outdoor recreation unless there was a staffing shortage, a lockdown, or bad weather that would have meant it was unsafe to be outside. Harvey also, generally, was able to attend religious or educational programming, go to work, go to the medical department, go to visitation, go to the library, and go to the chow hall for meals—all of which provided him opportunities to walk that would have taken him outdoors, even on days when officially scheduled outdoor recreation was not available. [*Id.* at ¶ 5]; [Dkt. No. 127-1 at ¶ 6].

9.      In HU6-3, Harvey also had other opportunities for recreation or exercise such as being in the pod to use the Kiosk (a unit like a computer that inmates can use to send or receive electronic messages), walking in the pod, watching television, listening to music, doing exercises in his cell, playing available board games, and using the telephone. In Harvey's housing area at that time, he was generally able to shower in the pod, order from the commissary, and converse with other inmates and staff. The cells have windows to the outside and natural light filters into the cells from the windows. [Dkt. No. 112-3 at ¶ 6].

10.     Staffing and/or security issues occasionally necessitate a limitation on the amount or type of recreation afforded to an inmate at GCC. GCC rotated staff to ensure that the same groups of inmates were not locked down or without recreation for extended periods of time. [*Id.* at ¶ 7].

11.     A review of Harvey's informal complaint and grievance forms submitted during April 2018 through July 2018 establish complaints about recreation being canceled on four dates: June 15, 2018, June 16, 2018, June 20, 2018, and June 27, 2018.

   a.  On June 15, 2018, Harvey filed Informal Complaint GCC-18-INF-03980 stating there was *limited outside recreation* at GCC. The response to Harvey informed him the limitation was due to limited staffing and security issues.

   b.  On June 20, 2018, Harvey filed Informal Complaint GCC-18-INF-04071 stating that late *night recreation* had been canceled on June 16, 2018. [Dkt. No. 1-1 at 29]. The response to Harvey informed him that late night recreation on the respective Friday and Saturday nights had been canceled due to staffing.[3]

   c.  On June 20, 2018, Harvey filed Informal Complaint GCC-18-INF-04070 stating that staff locked down the 300 pod of Housing Unit 6 three hours early. The response to Harvey informed him the pod was locked down due to staffing.

   d.  On June 20, 2018, Harvey filed Informal Complaint GCC-18-INF-04069 stating that the day and night shift lieutenants refused to allow any *outside recreation* on

---

[3] Plaintiff filed an informal complaint on June 20, 2018, complaining that outside recreation had been canceled on June 16, 2018 during the morning, afternoon, and early evening shifts. [Dkt. Nos. 1-1 at 5; 1-1 at 29-31; 1-2 at 2-4]. The complaint regarding June 16, 2018 was also addressed in Regular Grievance GCC-18-REG-00258. [Dkt. No. 1-1 at 31; 1-2 at 2-4].

June 16, 2018. [Dkt. No. 1-1 at 5]. The response to Harvey informed him that outside night recreation had been canceled due to staffing.

e.  On July 6, 2018, Harvey filed Regular Grievance GCC-18-REG-00259 stating that on June 16, 2018, he did not receive any *outside recreation*. The response to Harvey informed him that "it was not possible to pull outside recreation safely due to security concerns caused by numerous issues; however you were afforded one hour of in-pod recreation."

f.  On July 6, 2018, Harvey filed Informal Complaint GCC-INF-04558 stating that his housing unit was completely locked down on June 27, 2018. Specifically, Harvey stated that "[o]n Wednesday afternoon, June 27th, 2018: at 6:00pm my POD 300 of HU-6 was completely locked down for the entire DAY. During this time I wasn't allowed to use the phone to call my family, I wasn't allowed to use the microwave to cook me a meal, and I wasn't allowed to get some ice/for an ice-cold drink. Chronically locking this POD down, continues to be a perpetual issue." [Dkt. No. 1-1 at 13]. The response to Harvey informed him that his pod was on lock down with no in-pod recreation and no movement due to security staffing.

g.  On July 25, 2018, Harvey filed Regular Grievance GCC-18-REG-00300 stating again that his pod was locked dock with no movement on June 27, 2018. [Dkt. No. 1-1 at 5, 7-14]. The response informed Harvey the lockdown was due to security staffing.

[Dkt. No. 112-3 at ¶ 12] (emphasis added).

12.     During the period of April 11, 2018 through July 6, 2018, Harvey admits that he was outside of his cell for various matters: on April 11, 2018, Harvey was preparing to go to the law library [Dkt. No. 141 at 1]; April 13, 2018, Harvey was in medical [Dkt. No. 137-1 at 153]; on May 29, 2018, he complained about the food that was served [Dkt. No. 1-2 at 5]; and on July 6, 2018, Harvey was in the law library and alleges he was "obstructed" by Defendant Coleman from working on his case, and Coleman moved Harvey to HU-8. [Dkt. Nos. 1 at 28; 1-1 at 17; 110 at 15; 37-1 at 123].

13.     Holloway has no personal knowledge concerning Harvey's allegations that he was not provided with adequate recreation and/or exercise opportunities at GCC; was not routinely on-site at GCC during the period of April 11, 2018 through July 6, 2018; and was not involved with

scheduling Harvey's recreation or exercise opportunities during the months of April through July 2018. [Dkt. No. 112-4 at ¶ 5].

14.     Holloway does not have access to inmate Harvey's medical records and has no knowledge of his medical issues. If an inmate has a medical concern, he may sign up for sick call at his facility and a health care provider will address his concerns. [*Id.* at ¶ 6].

15.     Holloway is not a medical doctor and has no medical training beyond basic first aid and CPR. From April through July 2018, Holloway had no knowledge that any reduction to a person's physical exercise level could cause hemorrhoids, anal dryness, or digestive issues. Holloway has no personal knowledge that any reduction in a person's physical exercise level is likely to cause those physical symptoms or that a reduction in a person's physical exercise creates a substantial risk that those physical symptoms will occur. [*Id.* at ¶ 7].

16.     In April through July 2018, Bailey did not intentionally deny inmate Harvey any available opportunities for recreation or exercise, nor was Bailey indifferent to Harvey's or any inmate's need to recreate and/or exercise. As the Warden Senior at GCC, Bailey did not schedule recreation times for inmates. [Dkt. No. 112-3 at ¶ 9].

17.     Bailey does not have access to inmate Harvey's medical record and has no personal knowledge of his medical issues. If inmate Harvey suffered from hemorrhoids as he alleges or had any other medical concern at GCC, he was able to sign up for sick call, and a health care provider would address his medical concerns and complaints. [*Id.* at ¶ 10].

18.     Bailey is not a medical doctor and has no medical training beyond basic first aid and CPR. During April through July 2018, Bailey had no knowledge that any reduction to a person's physical exercise level could cause hemorrhoids, anal dryness, or digestive issues. Bailey still to this day has no personal knowledge that any reduction in a person's physical exercise level

8

is likely to cause those physical symptoms or that a reduction in a person's physical exercise creates a substantial risk that those physical symptoms will occur. [*Id.* at ¶ 11].

19.     During April through July 2018, Coleman worked in GCC's HU6, and remembers that Harvey was assigned to HU6-3. During April through July 2018, inmates had outside recreation opportunities every day. The opportunity for outside recreation, however, may have been canceled due to weather issues (thunder and/or lightning), staffing shortages, or if there was a lockdown in place at the prison. Opportunities for in-pod recreation may also have been affected from time to time, but not on a consistent or prolonged basis. [Dkt. No. 127-1 at ¶ 4].

20.     In addition to being afforded recreation or exercise opportunities, inmates in HU6-3 were permitted to be in the housing unit pod to use the Kiosk for sending or receiving secured messages, watch television, listen to music, or sit at the pod tables to play cards or other activities with other inmates. An inmate could also walk the pod area for exercise. Harvey could exercise in his cell by walking in place, doing jumping jacks, push-ups, sit-ups, or other exercises if he wanted to. [*Id.* at ¶ 5].

21.     Coleman has no recollection if, while he was at GCC, Harvey was denied outside recreation or exercise opportunities from April through July 2018. Coleman did not prevent inmate Harvey from any available opportunities at GCC, and Harvey had other ways to recreate or exercise if there was no outside recreation on a particular day. [*Id.* at ¶ 7].

22.     Harvey had access to medical services at GCC. If he suffered from hemorrhoids or other medical concerns, he could have submitted an emergency grievance or signed up for sick call. Coleman did not prevent Harvey from accessing medical services at GCC. All inmates at GCC have access to medical services. [*Id.* at ¶ 8].

23.     Coleman is not a medical doctor and has no medical training beyond basic first aid and CPR. During April through July 2018, Coleman had no knowledge that any reduction to a person's physical exercise level could cause hemorrhoids, anal dryness, or digestive issues. Coleman has no personal knowledge that any reduction in a person's physical exercise level is likely to cause those physical symptoms or that a reduction in a person's physical exercise causes a substantial risk that those physical symptoms will occur. [*Id.* at ¶ 9].

24.     Harvey's medical records establish that his problem with hemorrhoids began years before he was transferred to GCC. Harvey's prescription records indicate he was prescribed suppositories and fiber laxatives beginning in August and October of 2017. [Dkt. No. 50-1 at 66, 73]. The medical notes from an appointment on February 13, 2018, prior to his transfer to GCC, indicate that Harvey complained about his hemorrhoids, constipation, and rectal bleeding and that the "onset" of these medical complaints began in 2015. [Dkt. No. 50-1 at 59]. The medical records Harvey submitted also indicate that he complained about hemorrhoids on September 25, 2017, before his transfer to GCC. [*Id.* at 17].[4]

25.     The medical records Harvey submitted indicate only one instance during the April through July 2018 period where he requested to see medical personnel. On April 12, 2018, Harvey requested medical attention because he had been assaulted by another prisoner, and he was placed on sick call for the following morning. [Dkt. No. 55-1 at 15]. On April 13, 2018, Harvey was seen, evaluated, and prescribed medications. [Dkt. No. 66 at 213]. Harvey has not identified any instance in the nearly 1,000 pages of records he filed in this matter where he requested and was denied medical attention.

_____

[4] Plaintiff received a copy of his medical records on or before June 7, 2019. [Dkt. Nos. 10-1 at 57; 50]. The records establish that he has been seen frequently for his chronic problems with hemorrhoids before and after his transfer to GCC. [Dkt. No. 137-1 at 1-2]. The medical notes from May 19, 2022, indicate that he is still complaining about constipation and he was prescribed ointment for his hemorrhoids as well as suppositories. [*Id.* at 3].

*B. Claim 8, Retaliation Move on May 17, 2019*
*(Defendants Green and Coleman)*

26.     In May 2019, HU6-3 housed the Shared Allied Management ("SAM") Unit at GCC, which is reserved for inmates that may be vulnerable to victimization by other inmates due to their cognitive impairment. SAM Unit Programming focused on stabilizing and increasing an inmate's resiliency to determine if the inmate is appropriate for living in general population. [Dkt. No. 112-1 at ¶ 5].

27.     Harvey was assigned to the SAM Unit (HU6-3) from October 15, 2018 through May 17, 2019. [*Id.* at ¶ 6].

28.     On April 15, 2019, the Institutional Classification Authority ("ICA") reviewed Harvey's assignment to the SAM Unit at GCC. Green *recommended* to the ICA Committee that Harvey be removed from the SAM Unit due to alleged predatory behavior, which was not conducive to the SAM Unit. [*Id.* at ¶ 7, page 4]. The ICA Committee Report establishes that, per the recommendation of the SAM Joint Committee (which included mental health staff), Harvey was able to function in a mainstream general population setting. [*Id.*]. On April 15, 2019, the ICA made the decision to move Harvey from the SAM Unit back to general population as indicated on the form, which indicates the recommendation was "Approved."[5] [*Id.* at 4].

---

[5] Plaintiff's amended complaint alleges that Defendants Coleman and Green removed him from the SAM Unit on May 17, 2019, in retaliation for his filing a lawsuit against them over the loss of his television [Dkt. No. 10 at 18]. Plaintiff stated in his appeal of the denied grievance that Coleman, Green, and Tucker (the SAM Pod Committee) had "removed" him from the SAM Unit as retaliation after they were informed by the mailroom that Plaintiff was attempting to take legal action against them about his stolen television. [Dkt. No. 1-2 at 30-33]. In Plaintiff's September 28, 2022 Declaration in support of his motion for summary judgment, he averred that Green learned of the lawsuit after it was sent out through the prison mail system on May 15, 2019. [Dkt. No. 106 at 73, 78]. Plaintiff asserts that he heard Green tell Coleman they "'were kicking him out of housing unit (6) six, and for good this time,'" informing Coleman of Green's "strong displeasure of [Plaintiff] exercising [his] First amendment right of access to the courts," with which Coleman agreed and placed Plaintiff's name on the move list for the next day. [*Id.* at 75]. These statements, which are assumed true at this stage, do not establish that either Green or Coleman made the decision to remove Plaintiff from the SAM Unit—a decision that was made more than a month before the conversations upon which Plaintiff relies.

In his January 12, 2023, reply to Defendants' motion for summary judgment, however, Plaintiff modifies his position from Coleman and Green removed him from the SAM Unit as an act of retaliation to Coleman and Green "failed to

29.     On May 16, 2019, Harvey overheard Green on the telephone. The caller informed Green that Harvey was suing Green and Coleman concerning Harvey's stolen TV. [Dkt. No. 105 at 4]. Green told Coleman "that Harvey was in the process of taking legal action against them and directed Coleman to place [Harvey]'s name on the move sheet for Friday, May 17, 2019." [*Id.* at 5].

30.     On May 17, 2019, Defendants Coleman and Green escorted Harvey from the SAM Unit (HU6-300) to HU7-100, general population. [Dkt. No. 112-1 at ¶ 8].

31.     The delay between the ICA Committee's decision on April 15, 2019 and the move on May 17, 2019 was due to the need to find an available and appropriate bed space for Harvey in general population. [*Id.* at ¶ 8].

32.     Harvey filed informal complaints about the move and Green responded to several. On May 23, 2019, Green informed Harvey that he did not decide to move Harvey out of the SAM

---

make their recommendations regarding Plaintiff's May 17, 2019 move based only on the facts" presented to the ICA Committee. [Dkt. No. 137 at 8]. Plaintiff's response relied, in part, on the April 15, 2019 ICA Committee decision, which he attached as an exhibit [Dkt. No. 137-1 at 136]. Plaintiff's modification of his position is most likely an attempt to amend Claim 8 in light of the April 15, 2019 ICA Committee decision and Coleman's and Green's unrebutted affidavits. *See infra* notes 7 and 8; pp. 22–23.

Thereafter, in the same January 12, 2023 reply, Plaintiff reverts back to his original claim and avers that Green and Coleman were on the committee that made the decision to move him on April 15, 2019. [Dkt. No. 137 at 49, 53]. Plaintiff's assertion that "both Coleman and Green have already stated that they conducted an ICA Hearing to review Plaintiff's assignment to the SAM Unit at GCC on April 15, 2019" is not based upon personal knowledge but on a misrepresentation of Green's and Coleman's affidavits. For instance, he cites the portion of Green's affidavit that states Green "conducted" an ICA hearing. But Plaintiff omits Green's description of his participation—which was to submit a recommendation to the ICA Committee—and Green's express averment that he did not "authorize" Plaintiff's removal from the SAM Unit as retaliation or decide where Plaintiff would be transferred because such decisions on housing are made by the records department. [Dkt. No. 112-1 at 2-3].

At bottom, Plaintiff has not disputed the fact that the ICA Committee issued the April 15, 2019 decision removing him from the SAM Unit; he has admitted he was not at the hearing; and he has not rebutted Coleman's and Green's averments that each was not a member of the April 15, 2019 ICA Committee that authorized Plaintiff's transfer. Further, none of the statements attributed to Green and Coleman constitute decisions to transfer Plaintiff, and are not inconsistent with the unrebutted April 15, 2019 ICA Committee decision and the unrebutted affidavits of Green and Coleman (which admit they moved Plaintiff on May 17, 2019). However, simply because Green and Coleman "moved" Plaintiff from the SAM Unit to his new housing assignment does not establish that either was part of the decision to transfer him. The fact that each Defendant escorted him on May 17, 2019, is not in dispute. [Dkt. No. 112-1 at ¶ 8]. Consequently, there is no dispute of fact that the decision to transfer Plaintiff from the SAM Unit was made by the ICA Committee on April 15, 2019, and that neither Green nor Coleman were members of that ICA Committee.

Unit, the decision was made by a committee, and that if Harvey did not think he could be managed in a general population setting then he should talk to his mental health counselor about being reconsidered for the SAM Unit. [Dkt. 106 at 162].

33.     In his next informal complaint, Harvey alleged that Green, Coleman, and his counselor (Tucker), the "SAM Pod Committee," had removed him from the SAM Unit. [*Id.* at 163; Dkt. No. 1-2 at 30–33]. On June 17, 2019, Green responded that the SAM Pod Committee had not made the decision and that the decision had been made by another committee composed of the Mental Health Director and two other VDOC employees. [*Id.*].

34.     Harvey's next informal complaint was against Ms. Parker-Lundy, a member of the committee that made the decision to remove Harvey from the SAM Unit. Green responded to the complaint because Parker-Lundy was no longer a VDOC employee. Green advised Harvey to talk to his mental health counselor about "re-consideration for the SAM Pod" if he did not believe he would "adjust well" in general population. [*Id.* at 164].

35.     Harvey's next informal complaint about his removal from the SAM Unit named Parker-Lundy and Macado (a mental health official). Macado responded stating that he had not been involved in the decision to remove Harvey from the SAM Unit and was not "privy to what . . . happened in [Harvey's] case." [*Id.* at 165].

36.     Green did not authorize Harvey's removal from the SAM Unit as an act of retaliation, and has no recollection that Harvey had a television that was stolen when he was in the SAM Unit. An inmate's property has nothing to do with his assignment to or removal from the SAM Unit. [Dkt. No. 112-1 at ¶ 9]. Green's recommendation to the ICA Committee was not due to Harvey's allegations about a stolen television or his statements that he would sue staff; those allegations also had no bearing or impact on Harvey's transfer from the SAM Unit. [*Id.* at ¶ 11].

37.     While Green recommended that Harvey be removed from the SAM Unit, Green did not decide where Harvey would be housed once he left the SAM Unit. If an inmate was removed from the SAM Unit, VDOC employees in the GCC records department determined the appropriate housing for that inmate, including his new cell or housing unit and his cell mate. Green never made those decisions, and Green did not choose the cell, section, or housing unit where Harvey was housed at any time while he was at GCC. [Dkt. No. 112-1 at ¶ 12].

38.     Green understands inmates may file lawsuits and grievances about prison conditions and that as a prison employee, Green may be the subject of those grievances and lawsuits. Green does not make decisions concerning inmates' safety because they may have filed lawsuits or grievances against him or threatened to do so. [*Id.* at ¶ 10].

39.     Coleman did not make the decision to remove Harvey from the SAM Unit at GCC. On occasion, Coleman was a member of the SAM Joint Committee that reviewed an inmate's progress in the SAM Unit and made recommendations based on the inmate's progress, but Coleman did not do that for Harvey. Coleman has no recollection of when Harvey was transferred out of the SAM Unit in 2019 or why he was moved. [Dkt. No. 112-1 at ¶ 12].

40.     Even if Coleman had been involved in a decision or recommendation to remove Harvey from the SAM Unit, Coleman did not make decisions about where inmates at GCC were to be housed. If an inmate was removed from the SAM Unit, VDOC employees in the GCC records department determined the appropriate housing for that inmate, including his new cell or housing unit and his cell mate. Coleman never made those decisions, and he did not choose the cell, section, or housing unit where Harvey was housed at any time while Harvey was at GCC. [*Id.* at ¶ 13].

41.     Coleman did not retaliate against inmate Harvey for any reason while Coleman worked at GCC. Coleman did not deny him out-of-cell access or access to outside

exercise/recreation. Coleman also did not retaliate against him when he was moved out of the SAM Unit. [*Id.* at ¶ 14].

42.     Coleman understands inmates may file lawsuits and grievances about prison conditions and that as a prison employee, Coleman may be the subject of those grievances and lawsuits. Coleman did not make decisions concerning inmates' safety because they may have filed lawsuits or grievances against him or threatened to do so. [*Id.* at ¶ 15].

## II.     Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The moving party bears the burden of proving that judgment on the pleadings is appropriate, *i.e.*, that no genuine issues of material fact are present for resolution. *See Celotex Corp.*, 477 U.S. at 322–23. The facts which a moving party bears the burden of proving are those which are material. *Anderson*, 477 U.S. at 248.

Once a moving party has met its burden of proof, the non-moving party must produce specific facts to generate a disputed issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court will view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 245 (4th Cir. 1997). Nevertheless, "[o]nly disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

The non-moving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory

allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). This applies even where the non-moving party is a *pro se* prisoner. *Campbell-El v. Dist. of Columbia*, 874 F. Supp. 403, 406–07 (D.C. 1994); *see also* Local Civil Rule 7(K)(3) (to defeat a dispositive motion, a *pro se* party "must identify all facts stated by the moving party with which the *pro se* party disagrees and must set forth the *pro se* party's version of the facts by offering affidavits . . . or by filing sworn statements . . . .").[6] Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir. 1986). Similarly, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment; the dispute must be both "material" and "genuine," meaning that it "might affect the outcome of the suit under the governing law." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001) (emphasis omitted).

## III.    Cross Motions for Summary Judgment

Plaintiff's motion for summary judgment is, at best, difficult to follow because he argues about matters irrelevant to either of the two remaining claims. As the moving party, Plaintiff has the burden of production, and he has not established that he is entitled to judgment as a matter of law. Plaintiff's own exhibits, which are part of the summary judgment record, support Defendants' motion for summary judgment and contribute to his failure to prove causation. The record before the Court simply does not justify granting Plaintiff's motion for summary judgment on either Claims 2 or 8.

---

[6] "Generally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing Rule 56(e), Fed. R. Civ. P.). Affidavits must "be made on personal knowledge, set out facts admissible in evidence, and show that the affiant is competent to testify on the matters stated." *Harris v. Mayor & City Council of Balt.*, 429 F. App'x 195, 198 n.5 (4th Cir. 2011). Additionally, "summary judgment affidavits cannot be conclusory . . . or based upon hearsay." *Evans*, 80 F.3d at 962. As previously noted, the Fourth Circuit recently observed that a plaintiff's "unsupported belief" is not sufficient to establish intent and survive a motion for summary judgment because "without evidence a reasonable person could not conclude" that the defendant had the requisite intent. *See supra* at note 6 (discussing *Robinson*, 2023 U.S. App. LEXIS 14884, *8–9).

Defendants' motion for summary judgment is unrebutted on the material points of each claim. As to Claim 2, Defendants argue that the amount of recreation time lost was not substantial, that the record does not establish deliberate indifference, and that Plaintiff's medical conditions were chronic and predated his transfer to GCC by several years. The argument for judgment on Claim 8 relies on the lack of causation as well as the fact that Plaintiff, throughout his time at GCC, has continuously exercised his First Amendment right to grieve and to file and litigate civil actions—including while he was being transferred from the SAM Unit. Plaintiff's responses ignore the relevant legal points in the context of summary judgment and focus on matters that have been dismissed or are irrelevant and immaterial.

## A.     Claim 2

Depriving an inmate of the opportunity to exercise is a condition of confinement that may violate the Eighth Amendment's protection against cruel and unusual punishment in certain circumstances. *See Mitchell v. Rice*, 954 F.2d 187, 193 (4th Cir. 1992). A plaintiff seeking to demonstrate that prison conditions violated his Eighth Amendment rights "must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference . . . on the part of prison officials.'" *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991)). Further, to satisfy the objective component regarding past conditions of confinement, a prisoner must "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Ordinarily, to violate an inmate's Eighth Amendment rights, officials must generally completely deny an inmate the right to exercise for "an extended period of time," *and* the inmate must suffer a "specific harm resulting from the deprivation." *Brown v. Lamanna*, 304 F. App'x

206, 207 (4th Cir. 2008). Without some indication that the restriction negatively impacted the inmate's physical or mental health, there is no Eighth Amendment violation. *See, e.g.*, *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980). To determine whether a deprivation of outdoor exercise amounts to a sufficiently serious deprivation under the Eighth Amendment, "courts should consider the totality of the circumstances, including, but not limited to, the length of the deprivation, the availability of recreation within the cell, and whether the inmate suffered any ill health effects as a result of the deprivation." *Barndt v. Wenerowicz*, 698 F. App'x 673, 677 (3d Cir. 2017). The Fourth Circuit has recognized that an examination of the circumstances in each case is necessary because "confinement or punishment conditions imposed under one set of circumstances may constitute an Eighth Amendment violation; yet the same conditions, imposed under different circumstances, would not." *Mitchell*, 954 F.2d at 191; *see also Rivera v. Mathena*, 795 F. App'x 169, 174 (4th Cir. 2019) (noting that a "complete deprivation of exercise for an extended period of time violates the Eighth Amendment" for an inmate in restrictive housing, but three days without showers for the same inmate would not) (cleaned up).

After reviewing the summary judgment record, the Court finds that Plaintiff has failed to establish a complete denial of his opportunities to exercise or recreate. The record establishes that during Plaintiff's confinement at GCC, from April to July 2018, any deprivation of outdoor exercise was brief, and that even during those brief periods Plaintiff had several alternative opportunities for exercise. The record further establishes that Plaintiff complained about being denied outside recreation on four days during the April through July 2018 time period, and on two of those four days (June 15 and 16, 2018) he had indoor opportunities if he chose to pursue them.

Plaintiff alleges that Defendants Coleman, Bailey, and Holloway were deliberately indifferent to his serious medical needs because they denied him "adequate indoor and outdoor

recreational time" from April 13, 2018 through July 6, 2018, and that their indifference resulted in serious harm (hemorrhoids, anal dryness, and other health issues). [Dkt. No. 10 at 13]. Plaintiff, however, fails to rebut or contradict Defendants' evidence concerning other opportunities to exercise, socialize, shower, and recreate over the alleged period of approximately three months. On the four dates noted, outdoor recreation was limited or canceled due to staffing issues. Even if outdoor recreation had been canceled, the summary judgment record establishes that Plaintiff had other opportunities for out-of-cell time and that he was free to exercise in his cell. Moreover, Plaintiff admits that during this period he was out of his cell and housing unit—he went to meals, the medical department, and the law library. He also had the opportunity for indoor activities such as using a computer, walking in the pod, watching television, listening to music, exercising in his cell, playing board games, using the telephone, showering, ordering from the commissary, and socializing. [Dkt. No. 112-2 at ¶¶ 4-7]. The summary judgment record establishes that Plaintiff had adequate opportunities for recreation and exercise during the three-month period even when there were temporary limitations due to staffing issues.

Further, the serious injury upon which he relies (his hemorrhoids and anal dryness) was not caused by the brief periods he was deprived of outdoor recreation. Plaintiff has produced no evidence linking the alleged lack of exercise to his health issues.[7] To the contrary, the medical

---

[7] Claim 2 alleges a deprivation of a condition of confinement (recreation or exercise) that caused a serious injury. Plaintiff's recent pleadings [Dkt. Nos. 135, 139] indicate that he is either trying to amend Claim 2 into a claim involving his diet (involving chicken parts in his food) by his repeated references to food operating procedures, menu lists, ingredients, preservatives, by-products, fillers, additives, and chemicals added to food served at Greensville [Dkt. No. 135 at 2-3, 5, 7 (citing Dkt. Nos. 43, 120, 121)], or he is attempting to resurrect claims that have been dismissed. In his "Declaration," filed with his motion for summary judgment, he spends significant time discussing dismissed claims. [Dkt. No. 106 at 1-14, 157, 168-71, and 180-84]. To the extent Plaintiff is seeking to amend either Claim 2 or Claim 8, or add new claims, a claim raised in opposition to a motion for summary judgment is not properly before the Court. *See Klein v. Boeing Co.*, 847 F. Supp. 838, 844 (W.D. Wash. 1994). Plaintiff cannot amend his complaint by raising new matters in a response to a motion. *See also Hurst v. Dist. of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017) ("a plaintiff may not amend her complaint via briefing") (citing *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)). Further, Plaintiff is "bound by the allegations contained in [his] complaint

records submitted by Plaintiff show that his hemorrhoids and anal dryness were chronic conditions that existed for several years before his transfer to GCC, and those chronic conditions were treated in the same manner after his transfer to GCC as they were before his transfer. *See supra* at ¶ 26. Constitutional torts require a plaintiff to establish "both but-for and proximate causation." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). Plaintiff has established neither. *Cf. Jamison v. Amonette*, No. 7:18cv504, 2022 WL 326095, at *12 (W.D. Va. Feb. 3, 2022) (holding that a deliberate indifference claim concerning complex health issues required expert testimony on causation in a case where an inmate alleged complications resulting from his celiac disease).

**B.      Claim 8**

To state a claim of retaliation under § 1983, a plaintiff must establish that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (cleaned up). An inmate must present more than conclusory accusations of retaliation, *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994), and must provide facts that show the exercise of his constitutional right was a substantial factor motivating the retaliation. *See, e.g.*, *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996); *Hughes v. Bedsole*, 48 F.3d 1376, 1387 n.11 (4th Cir. 1995). Mere "temporal proximity" between the inmate's protected activity and the official's allegedly retaliatory action "is simply too slender a reed on which to rest" a § 1983 retaliation claim. *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993). A plaintiff must "be prepared to establish that but for the retaliatory motive[,] the complained of incident . . . would not have occurred," and he "must produce direct

---

and cannot, through the use of motion briefs, amend the complaint." *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

evidence of motivation, or the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995) (quoting *Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (5th Cir. 1989)).

In addition to showing causation, the inmate must also allege facts indicating that, as a result of the retaliatory action, he suffered some adverse impact on the continued exercise of his constitutional rights. *Am. Civil Liberties Union v. Wicomico Cnty.*, 999 F.2d 780, 786 (4th Cir. 1993) (finding that mere inconvenience in exercise of constitutional rights not adverse enough to constitute actionable retaliation). Notably, the Fourth Circuit has held that "the causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the state actor would not have taken the alleged retaliatory action." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (cleaned up).

Here, Plaintiff's own exhibits, as well as the unrebutted Defendants' exhibits, defeat his motion for summary judgment on the issue of causation. Plaintiff alleged that on May 16, 2019, Green and Coleman decided to retaliate against Plaintiff because Green was told Plaintiff was filing a lawsuit against them regarding his stolen television. The summary judgment record, however, establishes that the decision to transfer Plaintiff from the SAM Unit was not made on May 16, 2019, but was made approximately one month before, on April 15, 2019, by the ICA Committee—pre-dating the telephone call Green received about Plaintiff's lawsuit that supposedly formed the basis of the alleged retaliation.[8] The record also establishes that neither Green nor

---

[8] Plaintiff alleges that he was in the hallway and overheard Green on the telephone with someone from the mailroom on May 16, 2019, who informed Green that Plaintiff was attempting to sue Green and Coleman over the stolen television set. Green then passed Plaintiff in the hallway, entered Coleman's office, and then told Coleman "that Plaintiff was in the process of taking legal action against them and directed Coleman to place [Plaintiff]'s name on the move sheet for Friday, May 17, 2019." [Dkt. No. 105 at 5].

Coleman were on the April 15, 2019 ICA Committee. Moreover, after Plaintiff was transferred, neither Coleman nor Green had any involvement as to where he was transferred. Indeed, Green, in answering Plaintiff's informal complaints about his transfer, provided Plaintiff with the name of a person who he knew was on the April 15, 2019 ICA Committee and further advised Plaintiff that if he did not think he could be managed in a general population setting he should talk to his mental health counselor about being reconsidered for the SAM Unit. [Dkt. 106 at 162]. The ICA Committee's April 15, 2019 decision, which Plaintiff has not disputed, negates any causal connection between Green or Coleman and the transfer decision.[9]

Even assuming Plaintiff was engaged in a protected First Amendment activity, Plaintiff's motion fails on the second and third elements of a retaliation claim because the record establishes that the decision to transfer Plaintiff was made on April 15, 2019—over a month before he alleges Green unilaterally made the decision—by a committee of which neither Green nor Coleman were members and for reasons unrelated to the alleged lawsuit and grievances about the stolen television. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *De'Lonta v. Fulmore*, 745 F. Supp. 2d 687, 690–91 (E.D. Va. 2010) ("a named defendant must have had personal knowledge of and involvement in the alleged violations of plaintiff's constitutional rights for the action to proceed against him").

---

[9] As noted above, Plaintiff attempts to amend his claim by asserting that Coleman and Green "failed to make their *recommendations* regarding Plaintiff's May 17, 2019 move based only on the facts." [Dkt. No. 137 at 8] (emphasis added); *see supra* note 6. "A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (complaint may not be amended by brief in opposition to motion to dismiss)); *see Barclay White Skanska, Inc. v. Battelle Mem. Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) ("despite the liberal pleading rules outlined by the Supreme Court, plaintiffs may not raise new claims without amending their complaints after discovery has begun") (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). Further, Plaintiff acknowledges that he was not present during the April 15, 2019 hearing and, as noted above, his "belief" is not sufficient to establish his entitlement to summary judgment. *Cf. Robinson*, 70 F.4th at 782.

Defendants also correctly note that Plaintiff's transfer had no demonstrable impact on Plaintiff's filing of grievances or the conduct of his litigation. In the approximate two-week period shortly after his transfer, Plaintiff filed sixteen informal complaints alleging various violations, on various dates, by various VDOC personnel or contractors.[10] Furthermore, Plaintiff, who has admitted he was not present when the ICA Committee convened on April 15, 2019, and he has submitted no evidence that either Green or Coleman had anything to with the decision to transfer him. Plaintiff has relied solely on the temporal proximity between the telephone call that he avers he heard and his transfer the next day. As previously noted, the alleged telephone call does not establish that either Coleman or Green made the decision to move Plaintiff on May 16, 2019, only that Plaintiff was to be moved the following day.[11]

## IV. Conclusion

For the reasons stated herein, Plaintiff's motion for summary judgment [Dkt. No. 104] is DENIED, and Defendants Coleman, Green, Bailey and Holloway's motion for summary judgment [Dkt. No. 111] is GRANTED.

---

[10] *See, e.g.*, [Dkt. No. 10-1 at 57–69; 106 at 148, 157, 163]. Plaintiff obtained affidavits from two inmates to support his litigation on or about June 27, 2019; from a third inmate on or about July 9, 2019; and from a fourth inmate on or about July 16, 2019. [Dkt. No. 106 at 4–5, 6–7, 8–9, 10]. Plaintiff filed a companion civil action of sorts, *Harvey v. Maughan*, No. 20-cv-606 (E.D. Va. July 14, 2020), which was transferred to the Western District. The Western District dismissed that civil action on February 24, 2021. *Harvey v. Maughan*, No. 7:20-cv-405, 2021 U.S. Dist. LEXIS 34546 (W.D. Va. Feb. 24, 2021).

Plaintiff also continued to pursue a civil action, which he has frequently referred to in this matter, that he filed in the Western District. *Harvey v. Russell*, Case No. 7:18-cv-97 (W.D. Va. Jan. 14, 2022), *aff'd*, No. 22-6077, 2022 U.S. App. LEXIS 26521 (4th Cir. Sept. 22, 2022), *cert. denied*, 143 S. Ct. 2475 (2023). Plaintiff filed *Harvey v. Russell* on March 2, 2018, and litigated the matter through appeal and a petition for a writ of certiorari. Between May 17, 2019, the date of the alleged retaliation, through September 1, 2019, Plaintiff filed approximately sixteen items on the docket in that case. *See id.* (Dkt. Nos. 163, 165, 166, 167, 169, 173, 174, 175, 176, 177, 185, 187, 188, 189, 190, 191). It is clear from Plaintiff's conduct that "his access to courts has not been hindered or chilled in any way." *Daye v. Rubenstein*, 417 F. App'x 317, 319 (4th Cir. 2011).

[11] Whether Coleman or Green disliked Plaintiff, based upon this record, has no relevance. Further, placing Plaintiff's name on the "move sheet" for May 17, 2019 [Dkt. No. 106 at 75] is consistent with the April 15, 2019 decision by the ICA Committee to remove Plaintiff from the SAM Unit and the approximate one-month delay between the decision and the actual move due to the need to find an appropriate cell assignment for Plaintiff.

An Order will issue alongside this Memorandum Opinion.

_____
/s/
Michael S. Nachmanoff
United States District Judge

September 29, 2023
Alexandria, Virginia